UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SUSAN WILLIAMS MARKLAND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:14 CV 906 DDN |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Susan Williams Markland for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The parties have consented to the exercise of plenary authority by the undersigned Magistrate Judge under 28 U.S.C. § 636(c). For the reasons set forth below, plaintiff's claim is remanded for further development of the record.

## I. BACKGROUND

Plaintiff Susan Williams Markland, born May 6, 1966, applied for a period of disability and disability insurance benefits under Title II of the Social Security Act on April 27, 2011. (Tr. 126–132.) Plaintiff alleged an onset date of disability of April 13, 2009, due to pancreatitis and L5/S1 herniated disk and nerve damage. (Tr. 160–69.) Plaintiff's claim was initially denied on November 10, 2011. (Tr. 57–58.) On December 9, 2011, plaintiff filed a Request for a Hearing. (Tr. 70–71.) Plaintiff appeared and testified at a hearing before an ALJ on February 6, 2013, and on March 26, 2013, the ALJ found that plaintiff was not disabled. (Tr. 8–25.) Plaintiff exhausted all of her administrative remedies after the Appeals Council denied her Request for Review on March 6, 2014. (Tr. 1–5.) Thus, the decision of the ALJ stands as the final decision of the defendant Commissioner.

## II.  MEDICAL RECORD

### A.  Medical Records

On April 21, 2009, plaintiff sought treatment from Musaddeque Ahmad, M.D. for increasing urinary frequency and burning with urination.  Dr. Ahmad diagnosed a urinary tract infection and prescribed Darvocet for pain and Bactrim (an antibiotic).  Dr. Ahmad also noted that plaintiff had no back tenderness, weakness, fatigue, depression, anxiety, mania, sleep disturbances, or hallucinations.  (Tr. 617–18.)

On May 19, 2009, plaintiff visited Dr. Ahmad for a pain medication refill.  Dr. Ahmad continued plaintiff's prescription for Darvocet for plaintiff's pelvic pain.  (Tr. 619–20.)

On September  8, 2009, plaintiff again visited Dr. Ahmad for a pain medication refill. Dr. Ahmad noted that plaintiff complained of moderate to severe right hip pain as well as feeling down and depressed.  Dr. Ahmad stopped the Darvocet and prescribed Lorcet Plus for plaintiff's pelvic pain and Elavil for plaintiff's depression.  (Tr. 621–23.)

On October 24, 2009, plaintiff sought treatment from Dr. Ahmad due to not feeling well. Plaintiff complained of diffuse muscle aches, low grade fever, facial pain, headache, nasal congestion, sore throat, and related complaints.  Dr. Ahmad prescribed Mucinex DM (a cough suppressant), Amoxil (an antibiotic), Darvocet, and Elavil.  Dr. Ahmad also noted that plaintiff had no depression, anxiety, mania, sleep disturbances, and no hallucinations.  (Tr. 624–26.)

On February 8, 2010, Plaintiff visited Dr. Ahmad for medication refills.  Plaintiff complained of moderate-severe right hip pain that was "no worse, but still there" and was relieved by the current medication treatments.  Dr. Ahmad noted that plaintiff also complained of bilateral knee pain and denied lower back pain.  Dr. Ahmad decreased the dose for Darvocet and continued the Elavil.  (Tr. 627–29.)

On June 1, 2010, plaintiff saw Dr. Ahmad for a follow-up appointment.  Plaintiff again complained of hip pain and bilateral knee pain.  Dr. Ahmad also noted that plaintiff complained of mild to moderate chronic lower back pain.  Dr. Ahmad continued the Elavil prescription for depression and increased the Darvocet dosage.  (Tr. 630–32.)

On June 15, 2010, plaintiff had a nerve conduction study performed. The computer interpretation of the study stated "consider moderate right L5/S1 radiculopathy" and that "the likelihood of a left L5/S1 radiculopathy or proximal neuropathy is low."[1] (Tr. 645–46.)

On July 5, 2010, plaintiff saw Dr. Ahmad to discuss plaintiff's MRI results. Dr. Ahmad noted that the MRI of plaintiff's spine showed a "herniated disc in between L5 and S1 protruding towards the right side and causing intervertebral foraminal stenosis" which was consistent with plaintiff's symptoms. The MRI also showed a mass in the pelvic area. (Tr. 633.)

On December 2, 2010, plaintiff went to the Jefferson Regional Medical Center emergency department with a complaint of abdominal pain. The emergency department physician admitted plaintiff to the medical unit of the hospital. Upon admission, Dr. Ahmad ordered IV fluid, pain control, intravenous Rocephin (an antibiotic), a surgical consultation, and a genitourinary consultation. James Travis Methvin, D.O., performed the surgical consultation examination and saw no need for surgical intervention. Ryan T. Miller, M.D., performed the urology consultation examination and noted that the etiology of plaintiff's abdominal pain was unclear. Dr. Miller determined that the CT scan revealed no evidence of a high-grade obstruction in the right ureter to explain the degree of pain that plaintiff was experiencing. Dr. Miller recommended reevaluation by a general surgeon due to plaintiff's significant abdominal pain being suggestive of either an ulcer or gallbladder disease. (Tr. 271–90.)

On December 4, 2010, Mohideen A. Jamaluddin, M.D., performed a gastroenterology consultation examination of plaintiff. Dr. Jamaluddin diagnosed possible pyelonephritis and an abnormal CT scan of the pancreas. Dr. Jamaluddin's treatment plan included an endoscopic ultrasound of the pancreas as an outpatient. (Tr. 292–95.)

On December 4, 2010, Dr. Ahmad discharged plaintiff from the hospital with discharge diagnoses of urinary tract infection, right upper quadrant abdominal pain, history of recurrent urinary tract infection, status post recent ovary mass resection, and history of osteoarthritis of the knee and hip. (Tr. 296.)

On December 16, 2010, plaintiff saw Dr. Jamaluddin for a consultation examination following her hospitalization. Plaintiff complained of right upper quadrant abdominal pain, and a CT scan revealed a prominent pancreatic duct. Dr. Jamaluddin's plan of care included an

---

[1] Radiculopathy refers to disorder of the spinal nerve roots and neuropathy refers generally to a disorder affecting any part of the nervous system. See generally Stedman's Medical Dictionary (28th ed. 2007).

endoscopic ultrasound of the pancreas and a stool sample to rule out C. diff. colitis, an inflammation of the large intestine resulting from an infection. Dr. Jamaluddin noted that plaintiff's mood and affect were appropriate. (Tr. 225.)

On January 3, 2011, plaintiff saw Dr. Ahmad for medication refills. Plaintiff complained of right hip pain, bilateral knee pain, and worsening of lower back pain rated as mild to moderate. Dr. Ahmad advised plaintiff to see a pain management physician for her chronic pain management. (Tr. 639–40.)

On January 18, 2011, plaintiff was again seen by Dr. Jamaluddin for a follow-up examination. Dr. Jamaluddin noted that the CT scan findings were consistent with chronic pancreatitis and that plaintiff continued to have right upper abdominal pain. Dr. Jamaluddin again documented that plaintiff's mood and affect were appropriate. (Tr. 224.)

On February 8, 2011, plaintiff presented to Abdul N. Naushad, M.D., for pain management of chronic lower back pain, bilateral shoulder pain, and left knee pain. Dr. Naushad noted that plaintiff rated the pain as moderate-to-severe, and when the pain was present it "interferes only with some daily activities." (Tr. 391.) To treat her pain, Dr. Naushad prescribed gabapentin, hydrocodone-acetaminophen, and Mobic. (Tr. 391–94.)

On February 15, 2011, plaintiff returned to Dr. Naushad's office for further care. Dr. Naushad performed a lumbar transforaminal injection with flouroscopy guidance to relieve plaintiff's pain. Dr. Naushad followed up with telephone call to plaintiff on February 18, 2011 and noted that plaintiff was doing fine and had some tenderness at the injection site. (Tr. 386–87.)

On February 22, 2011, Dr. Naushad again saw plaintiff because of continued pain after the transforaminal injection. Plaintiff reported, that for her activities of daily living, her physical functioning was "bad" and her mood and sleep patterns were "better." Dr. Naushad performed a second lumbar transforaminal injection with fluoroscopy guidance on March 1, 2011. (Tr. 379–85.)

On March 8, 2011, plaintiff returned to Dr. Naushad's office for a follow-up appointment with Dr. Naushad for chronic pain. Dr. Naushad noted that plaintiff reported that the pain medications are helping but that she was having more pain "now that I have gone back to work." (Tr. 376.) Plaintiff's physical functioning was "ok," her mood was "better," and her overall

functioning was "ok." (Tr. 378.) Dr. Naushad increased the dose for hydrocodone-acetaminophen and added a prescription for orphenadrine for muscle pain. (Tr. 376–78.)

On March 15, 2011, Dr. Naushad performed a third lumber transforaminal injection with fluoroscopy guidance. (Tr. 373–75.)

On March 31, 2011, plaintiff was seen by Keely L. Cook, a physician assistant, in consultation with Dr. Aliperti for a new patient examination. Plaintiff was diagnosed with chronic pancreatitis and was prescribed one week of Vicodin for pain. (Tr. 517–18.)

On April 5, 2011, plaintiff was seen by Dr. Naushad for a follow-up examination. Plaintiff's physical functioning, mood, and overall functioning were all marked as "better." Dr. Naushad also reviewed the narcotic agreement with plaintiff and noted that no hydrocodone was present in plaintiff's urine from a March 8 urine drug screen to monitor medication consistency.[2] (Tr. 370–72.)

On April 11, 2011, plaintiff went to the Jefferson Regional Medical Center emergency department complaining of abdominal pain which began two days earlier. The emergency department physician admitted plaintiff to the medical unit with a diagnosis of abdominal pain. (Tr. 307–11.)

On April 12, 2011, Dr. Ahmad examined plaintiff in the hospital and noted that plaintiff complained of severe, stabbing right upper quadrant abdominal pain radiating to her scapula. Dr. Ahmad also noted that plaintiff denied anxiety, feeling depressed, and emotional problems. Dr. Ahmad ordered consultation with Dr. Jamaluddin, consultation with general surgery, pain control, and an abdominal ultrasound. Dr. Ahmad discharged plaintiff on April 14, 2011 with discharge diagnoses of anemia, acute right upper quadrant and epigastric pain, history of arthritis

---

[2] Dr. Naushad's documentation explains the need for urine drug screening of patients being prescribed controlled substances as follows:
> Caring for and treating patients on controlled substances poses unique challenges for both physicians and their staff. These challenges are serious and include: patients providing false and misleading medical histories, not maintaining compliance with therapeutic drug regimens and using illicit drugs. Patient's non-compliant behavior with prescribed medications, such as combining medications or using illicit drugs with legally prescribed ones, can result in harm to themselves and others. So the Urine Drug Screening can help to improve patient safety as it relates to accurately establishing medication use, identifying dangerous drug to drug cross-reactions and avoiding false patient dismissals based on inconsistent immunoassay tests.

(Tr. 367.)

of the hip and knee joints, history of ovary mass, and rule-out gallbladder dyskinesia. (Tr. 312–22.)

On May 3, 2011, plaintiff saw Dr. Naushad for a follow-up appointment. Dr. Naushad noted that plaintiff felt the medications were helping, but that the injections were starting to wear off. Dr. Naushad documented that a urine drug screening from April 5th was negative for hydrocodone-acetaminophen. Dr. Naushad also gave plaintiff a written warning for a second inconsistent, negative urine drug screen and gave notice that he would terminate the narcotic prescriptions if plaintiff continued to have negative urine drug screens. (Tr. 366–69.)

On May 20, 2011, plaintiff presented to the Jefferson Regional Medical Center emergency department complaining of abdominal pain. The emergency department physician noted that plaintiff's eyes were glazed and she avoided eye contact. The physician also noted that plaintiff was "very emotionless" with a depressed, flat affect. (Tr. 327.) The physician documented that plaintiff was not in severe pain two days ago when she saw a different physician despite now reporting that the pain had been ongoing for a week. (Tr. 326–30.)

On May 28, 2011, plaintiff presented to Missouri Baptist Hospital complaining of a fever and abdominal pain. During her hospital stay, plaintiff's gallbladder was noted to be much dilated. Daniel Hafenrichter, M.D., performed a laparoscopic cholecystectomy on June 1, 2011. Plaintiff's physician discharged her from Missouri Baptist Hospital on June 2, 2011 with discharge diagnoses of chronic pancreatitis, urinary tract infection with fever, and status post laparoscopic cholecystectomy. (Tr. 555–63.)

On June 7, 2011, plaintiff saw Dr. Naushad for a follow-up appointment. Dr. Naushad noted that plaintiff's pain medications were helping to improve plaintiff's daily functioning and that plaintiff reported that the medications were definitely helping. Dr. Naushad documented normal mood, affect, and capacity for sustained mental activity for plaintiff. He also documented that plaintiff's physical functioning was "ok" and family relationships, social relationships, mood, and sleep pattern were "better." (Tr. 362–65.)

On June 10, 2011, plaintiff went to Missouri Baptist Hospital complaining of abdominal pain, nausea, and vomiting. The physician noted that plaintiff occasionally helps her mother clean homes. (Tr. 575.) The attending physician requested a gastroenterology consultation from Richard Sylvanovich, M.D. Dr. Sylvanovich opined that plaintiff was experiencing an

exacerbation of underlying chronic pancreatitis. Plaintiff was discharged from the hospital on June 11, 2011. (Tr. 533–35.)

On July 8, 2011, plaintiff saw Dr. Naushad for a medication refill appointment. Dr. Naushad refilled prescriptions for gabapentin, hydrocodone-acetaminophen, Mobic, and orphenadrine citrate (a muscle relaxant). (Tr. 361.)

On August 2, 2011, plaintiff saw Dr. Naushad for a follow-up appointment for multi-focal pain. Dr. Naushad noted that plaintiff missed her previous appointment due to being the driver for her mother-in-law after her mother-in-law had an accident. Dr. Naushad documented that plaintiff's physical functioning and overall functioning were both "ok." Dr. Naushad prescribed gabapentin, hydrocodone-acetaminophen, Mobic, and orphenadrine citrate. (Tr. 398–400.)

On August 6, 2011, plaintiff went to Missouri Baptist Hospital complaining of abdominal pain, nausea, vomiting, and fever. Plaintiff was admitted to the hospital with an admission diagnosis of pyelonephritis (kidney infection) and gram-negative sepsis. Plaintiff was discharged on August 8, 2011 with the following medications: Cipro (an antibiotic), ferrous sulfate (iron supplement), omeprazole (to decrease the amount of acid produced in the stomach), Norco (hydrocodone-acetaminophen), Lexapro (an antidepressant), Mobic, pancrelipase (digestive enzyme), and a multi-vitamin. (Tr. 585–89.)

On August 31, 2011, plaintiff saw Dr. Sultan for a medication follow-up appointment. Dr. Sultan noted that the pain medications were helping and that plaintiff's pain was tolerable. Dr. Sultan also documented that plaintiff's physical functioning and overall functioning were both "ok." Plaintiff had failed to keep two previously re-scheduled appointments for lumbar injections due to family problems. (Tr. 395–97.)

On September 9, 2011, plaintiff was seen by Hamid Bashir, M.D. for joint pain. Dr. Bashir performed an intra-articular injection of Depo-Medrol in the right shoulder. Plaintiff also requested Norco and Dr. Bashir gave plaintiff 14 tablets of Norco. (Tr. 678–79.)

On December 6, 2011, plaintiff saw Dr. Bashir for a reassessment of her osteoarthritis. Plaintiff also requested to be tested for rheumatoid arthritis. Dr. Bashir performed an intra-articular injection of Depo-Medrol in the left shoulder. Dr. Bashir also refilled plaintiff's Norco prescription upon plaintiff's request. (Tr. 680–81.)

On March 6, 2012, plaintiff returned to Dr. Bashir for a follow-up appointment. Dr. Bashir performed intra-articular injection of Depo-Medrol in both shoulders. He also refilled plaintiff's pain medications. (Tr. 682–83.)

On April 11, 2012, plaintiff went to Missouri Baptist Hospital complaining of abdominal pain. The attending physician admitted plaintiff to the hospital and placed her on no oral intake restriction for bowel rest. Dr. Aliperti saw plaintiff on April 12, 2012 for a gastroenterology consultation examination and ordered a CT scan of the abdomen. The CT exam showed thickening consistent with colitis. The attending physician discharged plaintiff from the hospital on April 14, 2012 with prescriptions for Vicodin, Phenergan (for nausea), and Lipitor (for high cholesterol). (Tr. 600–07.)

On April 19, 2012, plaintiff saw Kirk Flury, M.D., to establish care with him. Dr. Flury ordered baseline laboratory tests and reviewed plaintiff's history. Dr. Flury's impressions included recurrent pancreatitis, degenerative lumbar disc disease with L5-S1 radiculopathy, progressive neuropathy of the right leg, status post hysterectomy, status post cholecystectomy, and ongoing opioid dependence. Dr. Flury prescribed Norco to plaintiff. (Tr. 452–68.)

On May 24, 2012, plaintiff saw Robert Backer, M.D., for her lower back pain. Dr. Backer ordered an MRI of the lumbar spine and prescribed a duragesic transdermal patch. Dr. Backer documented that he was not optimistic that the MRI would find something that he could treat. (Tr. 417–21.)

On June 4, 2012, plaintiff was seen by Ahmad Ardekani, M.D., her treating psychiatrist. Dr. Ardekani's notes are practically illegible and appear to be "boiler-plate" fill in the blank forms regarding medications and mood rather than counseling and therapy notes. The treatment notes listed some diagnoses and some medications but do not explain the basis for the diagnoses or medications. Plaintiff returned for a follow-up appointment on July 16, 2012 with Dr. Ardekani. Again, the treatment notes are practically illegible, although the handwritten word "okay" appears next to the subjective section of the form. The treatment notes stated that plaintiff's mood was "fair," anxiety was "low," and that plaintiff did not have panic attacks. (Tr. 510.) The treatment notes also indicated that plaintiff had "passive" suicidal thoughts but did not further explain these thoughts. (Tr. 508–511.)

On June 14, 2012, plaintiff returned to Dr. Flury to review the test results. Dr. Flury noted that plaintiff had no further problems and was clinically stable. (Tr. 469–74.)

On June 27, 2012, plaintiff saw Dr. Bashir and complained of right shoulder and right wrist pain. Dr. Bashir performed an intra-articular injection of Depo-Medrol in the right shoulder and a trigger point injection of Depo-Medrol in the right radial styloid. (Tr. 684–85.)

On September 6, 2012, plaintiff returned to Dr. Flury for a follow-up appointment. Dr. Flury issued a prescription for Norco, gabapentin, and other medications. (Tr. 475–82.)

On September 13, 2012, plaintiff presented to Dr. Bashir requesting an injection to the left shoulder. Plaintiff reported that her right shoulder felt much improved. Dr. Bashir performed an intra-articular injection of Depo-Medrol in the left shoulder and also continued plaintiff's Norco prescription. (Tr. 686–87.)

On October 8, 2012, plaintiff saw Dr. Ardekani, her treating psychiatrist. Plaintiff's mood was "fair," anxiety was "low," sleep was "good," appetite was "fair," and energy was "adequate." Dr. Ardekani again noted that plaintiff had passive suicidal thoughts but no self-injury or homicidal thoughts. Dr. Ardekani also documented that plaintiff was doing better on Adderall. Plaintiff's other medications included Celexa, Cymbalta, Buspar, and trazodone. (Tr. 512–13.)

On December 7, 2012, plaintiff returned to Dr. Bashir for a follow-up examination. Dr. Bashir performed an intra-articular injection of Depo-Medrol in the right shoulder. (Tr. 688–89.)

On January 14, 2013, plaintiff saw Dr. Ardekani, her treating psychiatrist. Plaintiff had a fair mood, low anxiety, and no panic attacks but continued to have passive suicidal thoughts. Dr. Ardekani and his staff assessed Plaintiff's global assessment of functioning (GAF) at 60.[3] Dr. Ardekani noted that plaintiff was tolerating her medications well. Dr. Ardekani changed plaintiff's medications by adding Prozac. The treatment notes fail to provide significant details on plaintiff's illness, disabilities, or prognosis. (Tr. 514–15.)

Dr. Ardekani's nurse, Nam Roberts, completed documentation titled "Physician's Assessment for Social Security Disability Claim" on January 14, 2013.[4] Nurse Roberts

---

[3] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34–35 (4th ed. Text Revision 2000) ("DSM IV-TR"). A GAF score in the 51–60 range indicates "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." Id.

[4] The documentation is unclear what participation, if any, Dr. Ardekani had in the preparation of this form. Plaintiff contends that Dr. Ardekani and Nurse Roberts completed the form together. (Pl's Br. at 10.) This Court's analysis assumes *arguendo* that Dr. Ardekani completed the

documented some basic clinical history and then wrote "[Plaintiff] can't hold [a] job." However, Nurse Robert's did not explain the basis for this conclusion. (Tr. 506.)

Dr. Ardekani's nurse also completed a Mental Residual Functional Capacity Assessment form. Nurse Roberts checked various boxes for mild, moderate, or marked in response to various statements regarding work performance but included no explanation about the basis for these answers. (Tr. 507.)

On November 9, 2011, David Hill, Ph.D., the State agency consultant, completed the Psychiatric Review Technique form. Plaintiff reported difficulty with concentration and handling stress. However, Dr. Hill noted that plaintiff "drives, shops, manages her own finances, uses a computer, and stated that she follows written and spoken instructions 'all right.'" (Tr. 415.) He also noted that plaintiff was stable on her medications for anxiety and depression and that plaintiff performed a wide range of daily activities that are consistent with work-like activity. Dr. Hill classified plaintiff's mental limitations due to depression and anxiety as non-severe. (Tr. 405–16.)

### B. Plaintiff's Testimony at Administrative Law Judge Hearing

The ALJ held a hearing on February 3, 2013 in Creve Coeur, Missouri. (Tr. 26–50.) Plaintiff and her counsel appeared at the hearing, and plaintiff testified to the following facts. Plaintiff lives at home with her husband and daughter. She graduated high school and attended some college. Plaintiff previously worked as a secretary, bus driver, and classroom aide. Plaintiff applied for unemployment benefits in 2010 and received the unemployment benefits for approximately one year. (Tr. 29–33.)

Plaintiff stopped working in 2010 due to pancreatitis, chronic bladder infections, back pain, and nerve pain. Her pancreatitis and associated pain continued after the removal of her gallbladder. She also has a restrictive diet and gets nauseous in the morning. (Tr. 33–34.)

She stated that she has neck pain and stiffness from being involved in car crashes dating back to 1984, but that she was able to work for a number of years despite those injuries. (Tr. 32–36.) Plaintiff takes pain medication for her back pain, and the medication gives her some relief

---

examination and the form. On remand, the ALJ may need to clarify this issue when further developing the record. See infra Parts V.B, V.C.

but not as much as she would like. (Tr. 38–39.) Additionally, plaintiff has shoulder pain that has been helped by shoulder injections. (Tr. 40.)

In April 2009, plaintiff's primary care physician prescribed antidepressant medications but plaintiff did not see a psychiatrist. Plaintiff sought care from a psychiatrist in June 2012 because her physician was no longer willing to prescribe the antidepressants. At that time she felt that her depression and panic attacks warranted psychiatric care. (Tr. 36–37.) However, plaintiff testified that she has been depressed for most of her life. (Tr. 41.)

Plaintiff testified that she spends "at least six hours" in her recliner on a typical day. (Tr. 45.) Plaintiff cooks dinner, but receives help from her fifteen year old daughter with some other household chores. She also testified that she is limited to lifting about twenty-five pounds. (Tr. 42.)

### III. DECISION OF THE ALJ

On March 26, 2013, the ALJ found plaintiff not disabled. (Tr. 8–25.) The ALJ found that plaintiff met all the insured status requirements through September 30, 2011. (Tr. 13.) At Step One of the prescribed regulatory decision-making scheme, the ALJ found that plaintiff has not engaged in substantial gainful activity since April 13, 2009, the alleged disability onset date. (Id.) At Step Two, the ALJ found that plaintiff has the following severe impairments: major depressive disorder, panic disorder, history of attention deficit disorder, generalized osteoarthritis, history of pancreatitis, degenerative disc disease of the lumbar spine, and degenerative joint disease of the cervical spine. (Tr. 13–14.)

At Step Three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or was medically equivalent to an impairment on the Commissioner's list of presumptively disabling impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 14–15.) Additionally, the ALJ found that plaintiff's mental impairments do not satisfy the "paragraph B" criteria or the "paragraph C" criteria.[5] (Id.) The ALJ found that plaintiff has only mild restrictions living her daily life, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Id.) The ALJ also

---

[5] "Paragraph B" and "paragraph C" criteria are listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.

found that plaintiff had experienced no episodes of decompensation of extended duration. (Tr. 15.)

Before considering Step Four, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform sedentary work. (Tr. 15.) Specifically, the ALJ found that plaintiff could do the following: lift and carry ten pounds occasionally, less than ten pounds frequently; sit at least six hours out of eight; stand and walk at least six hours out of eight; understand, remember, and carry out at least simple instructions and tasks; respond appropriately to supervisors and co-workers where contact is on a casual and infrequent basis. (Tr. 15–16.) At Step Four, the ALJ found that plaintiff could not perform any of her past relevant work. (Tr. 19.)

At Step Five, the final step in the sequential process, the ALJ determined that jobs exist in significant numbers in the national economy that plaintiff can perform based on plaintiff's age, education, work experience, and residual functional capacity. (Tr. 19–20.) The ALJ concluded that plaintiff had not been disabled under the Social Security Act, from April 13, 2009 through the date of the decision. (Tr. 20–21.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled.

20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140–42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.

Step Four requires the Commissioner to consider whether the claimant retains the Residual Functional Capacity (RFC) to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred in determining her RFC by failing to consider all of the evidence relevant to plaintiff's subjective complaints of pain when evaluating her credibility. The undersigned disagrees.

Plaintiff also argues that the ALJ improperly evaluated medical opinion evidence, and thus, the hearing decision was not supported by substantial evidence. The undersigned agrees that the decision was not supported by substantial evidence.

### A. Residual Functional Capacity and Credibility

RFC is what a claimant can do despite her limitations and must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of his or her limitations. Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 416.945(a). RFC is a medical question and the ALJ's RFC determination must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). While the ALJ is not restricted to medical evidence alone in evaluating

RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704. An "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p, 1996 WL 374184, at * 7 (Soc. Sec. Admin. July 2, 1996). As part of the overall evaluation of a claimant's allegations, an ALJ weighs the medical opinions in the record and resolves any conflicts. See Wagner v. Astrue, 499 F.3d 842, 848–50 (8th Cir. 2007); 20 C.F.R. §§ 404.1527, 416.927.

The ALJ must evaluate the claimant's credibility before determining a claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). A plaintiff's credibility is "primarily for the ALJ to decide, not the courts." Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). The ALJ must give serious consideration to a claimant's subjective complaints of pain, and must give good reason for discrediting a claimant's testimony. Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).

When evaluating a claimant's subjective complaints, the ALJ must consider objective medical evidence and evidence relating to various factors, including: (i) a claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) dosage, effectiveness, and side effects of medication; and (v) functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole. 20 C.F.R. §§ 404.1529, 416.929; Guilliams v. Barnhart, 393 F.3d 798, 802–03 (8th Cir. 2005); McKinney v. Apfel, 228 F.3d 860, 864 (8th Cir. 2000); Polaski, 739 F.2d at 1322. In rejecting a claimant's subjective pain complaints as not credible, ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams, 393 F.3d at 802 (citing Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003)).

Plaintiff argues that the ALJ failed to consider all of the evidence relevant to plaintiff's subjective complaints including a nerve conduction study, MRIs, the treatment notes of three physicians, and the dosage and effectiveness of medications. The ALJ, however, is not required to specifically discuss every piece of evidence submitted. See Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)). Likewise, "[a]n ALJ's failure to cite specific pieces of evidence does not indicate that such evidence was not considered." Id. (citing Black v. Apfel, 143 F.3d at 386.)

Here, the ALJ based his credibility determination on several relevant factors including plaintiff's working in the past with the same impairments, an inconsistent work history, plaintiff collecting unemployment benefits during the period of alleged disability, lack of medical evidence supporting the subjective complaints, failing to follow treatment advice, activities of daily living inconsistent with the alleged disability, and inconsistencies between her statements and other evidence in the record. (Tr. 13–19.)

The ALJ determined that plaintiff "undoubtedly has some pain" but found that there was insufficient evidence of her inability to engage in basic work activities. (Tr. 17.) The ALJ specifically noted that the evidence, "including the opinion of [plaintiff's] treating source," does not support plaintiff's alleged extent of disability. (Id.) Thus, plaintiff's claim that the ALJ failed to consider evidence of pain and pain treatment from the treating physicians is without merit because the ALJ did acknowledge that plaintiff experiences pain but disagreed with the extent of that pain and its impact on the ability to engage in work activities.

Substantial evidence exists in the record to support the ALJ's determination that plaintiff's subjective complaints regarding the extent of her pain were not entirely credible. First, plaintiff complains of back and joint pain that limits her movement, ability to sit and stand for long periods, and difficulty walking. (Tr. 16) However, Dr. Bashir, plaintiff's treating physician for her back and joint pain, determined that plaintiff's ability to sit and plaintiff's endurance are not affected and that she can work an eight-hour day. (Tr. 17.) Additionally, plaintiff's claim that she cannot vacuum or mop is inconsistent with her ability to mow the yard. (Tr. 19.)

Further, significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); see also Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) (stating that "acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling pain."). Plaintiff claims that since 2009 she has generally been confined to her recliner and testified that she usually spends between six and eight hours per day in the recliner. (Tr. 17.) The ALJ properly determined that the evidence in the record does not support a finding of disability to this extent. Plaintiff's testimony that she mows her grass on a riding lawnmower for 45 minutes without stopping is inconsistent with a claim of total disability that prevents gainful employment. (Id.) Such an activity would be expected to involve vibrations and navigation of

uneven terrain which would exacerbate her back pain. (Tr. 19.) Plaintiff's functioning as a "driver" for her mother-in-law is also inconsistent with a claim of disabling pain. (Tr. 398.)

Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999). The record contains ample evidence of plaintiff experiencing pain relief from medication and injections. (Tr. 38–39, 40, 362, 366, 370, 376, 395, 398.)

Although not conclusive, applying for unemployment benefits adversely affects credibility because an unemployment applicant "must hold himself out as available, willing and able to work." Smith v. Colvin, 756 F.3d 621, 625 (8th Cir. 2014) (citing Jerrigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991)). Plaintiff applied for and received unemployment compensation for a year during her period of alleged disability. (Tr. 16, 33.)

Thus, there is substantial evidence in the record and a sufficient explanation of the ALJ's determination of plaintiff's credibility.

## B. Consideration of Treating Physician Medical Opinion Evidence

The ALJ also properly considered the opinion of Dr. Ardekani, plaintiff's treating physician. Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. See 20 C.F.R. § 416.927(c)(1)–(2). However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. See Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007). Likewise, an ALJ may appropriately rely on non-examining opinions as part of his RFC analysis. See Hacker v. Barnhart, 459 F.3d 934, 935, 939 (8th Cir. 2006) (holding that the ALJ's RFC assessment was supported by substantial evidence, including the opinions from non-examining doctors). Ultimately, it is up to the ALJ to determine the weight each medical opinion is due. Id. at 936.

In this case, the ALJ properly considered Dr. Ardekani's statements and found them entitled to little weight. Assuming *arguendo* that the ALJ should have treated Nurse Nam Robert's opinion as that of a treating source, the ALJ gave sufficient reasons for giving little weight to the opinions of Dr. Ardekani and Nurse Roberts. Their opinion that plaintiff is unable to work is conclusory. A physician's opinion that a claimant is "disabled" or "unable to work" is entitled to no deference "because it invades the province of the Commissioner to make the ultimate disability determination." Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012)

(internal citation omitted); see also 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Moreover, this conclusory statement was not supported by treatment notes or a thorough analysis that is normally found in a psychological evaluation. Because of the poor quality of the documentation, it is unclear whether this statement was the opinion of the treating source or if it was a report of plaintiff's own words. Lastly, the ALJ noted that the documentation is internally inconsistent because a GAF score or 58 indicates only moderate impairment in the ability to function in the workplace. See Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996) (holding that physician opinions that are internally inconsistent are entitled to less deference than they would receive in the absence of inconsistencies).

The ALJ was entitled to give little weight to the opinions of Dr. Ardekhani and Nurse Roberts.

### C. Substantial Evidence and Development of the Record

It is well settled that an ALJ has a duty to develop the record fully and fairly. Snead v. Barnhart, 360 F.3d 834, 836–37 (8th Cir. 2004). This duty to develop the record "includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, that addresses the particular impairments at issue." Strongson v. Barnhart, 361 F.3d 1066, 1071–72 (8th Cir. 2004); see also Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (holding that it was improper for the ALJ to rely on the opinions of reviewing physicians alone); Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) (holding that "the opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole").

Here, the ALJ determined that plaintiff has major depressive disorder, panic disorder, and a history of attention deficit disorder. (Tr. 13.) The ALJ found that plaintiff's mental impairments are "severe" and have "more than a minimal impact on her ability to engage in basic activities." (Id.) The ALJ based these findings on Dr. Ardekani's treatment notes from 2012–2013. (Tr. 17–18.) Instead of relying on Dr. Ardekani's opinion (beyond the determination that the conditions were indeed severe), the ALJ found the opinion of Dr. Hill, the state agency consultant, persuasive. (Tr. 18.) Dr. Hill, a non-treating and a non-examining physician, opined that plaintiff's alleged mental disabilities were not severe. (Tr. 415.)

The ALJ's decision is internally inconsistent in finding that plaintiff's mental conditions were severe yet finding Dr. Hill's report persuasive and relying on the report. Moreover, Dr. Hill

reviewed plaintiff's records in 2011—before any assessment and treatment by Dr. Ardekhani—and determined that plaintiff's mental conditions were <u>not</u> severe. While an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence, see Prosch v. Apfel, 201 F.3d 1010, 1014 (8th Cir. 2000), Dr. Hill's report cannot be supported by such evidence since it directly conflicts with the ALJ's specific determination that plaintiff's mental conditions were severe.

By discounting Dr. Ardekani's opinion, the ALJ failed to adequately develop the record to resolve these inconsistencies and provide substantial evidence for his decision that plaintiff's mental conditions were not so severe as to impair her ability to work. Dr. Ardekhani is the only physician who treated or examined plaintiff about his mental condition and was the only physician who rendered an opinion consistent with the ALJ's finding that his mental conditions were severe. By disregarding the remainder of Dr. Ardekani's opinion, the record no longer contains substantial medical evidence to support the ALJ's findings regarding plaintiff's mental condition.

While the ALJ is entitled to weigh various opinions, the ALJ is not free to make his own independent medical findings. Pates-Fires, 564 F.3d at 946–47. If the record is underdeveloped, the ALJ needs to obtain clarifying information from the treating physician. Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). The ALJ has an obligation to clarify or augment the records if the medical evidence is insufficient, which may include contacting the treating physician, requesting additional records, ordering a consultative examination, or asking the claimant or others for additional information. 20 C.F.R. § 404.1520b (2012), 20 C.F.R. § 416.920b (2012); see also 77 Fed. Reg. 10655 (Feb. 23, 2012) (explaining that new regulations no longer require an ALJ to re-contact the treating physician and instead allow new alternative methods, in addition to re-contacting the treating physician, for an ALJ to acquire the necessary clarifying information to make a disability determination).

The ALJ's RFC determination is not supported by substantial evidence, because there is no evidence from a treating or examining physician regarding the extent of plaintiff's mental conditions. The ALJ failed to develop the record further by ordering a consultative examination of plaintiff by a qualified physician or psychologist or by re-contacting plaintiff's treating physician for additional clarifying information. See 20 C.F.R. § 404.1520b. In this respect, the RFC determination is not supported substantial evidence. Reconsideration of plaintiff's RFC

may lead to different final decision on whether or not plaintiff was disabled during the relevant time period.  See Lott v. Colvin, 772 F.3d 546, 549 (8th Cir. 2014) ("[I]t may be reversible error for an ALJ not to order a consultative examination when, without such an examination, [s]he cannot make an informed choice." (quoting Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986) (per curiam));  see also 20 C.F.R. § 416.917 (explaining that an ALJ may order additional testing if necessary to determine if the claimant is disabled).

## VI.  CONCLUSION

For the reasons set forth above, the court reverses the decision of the ALJ and remands the case for further development of the record regarding the extent of plaintiff's mental conditions and a reevaluation of plaintiff's RFC.  An appropriate Judgment Order is issued herewith.

    /S/   David D. Noce  
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 31, 2015.